Burks, J.,
delivered the opinion of the court.
William O. George, a citizen of Virginia and resident of the city of Richmond, died in said city intestate on the 16th day of August, 1869. At the time of his death, he was possessed of some personal estate, and-was the owner of real estate supposed to be worth from sixty to seventy-five thousand dollars. Caroline Jackson, a negro and former slave of William O. George, was the mother of two children, Lee and Adelaide, of whom the said William O. George was the father. He removed the mother and her two children to the city of Philadelphia in the year 1854 or 1855, where they have ever since resided.
*301 In a very short time after the death of William O. George, the woman Caroline and her two children, her daughter, Adelaide, having intermarried in Philadelphia with one Constant C. Willamin, set up a claim to the estate of William O. George, based on an alleged marriage of the said William O. George and the said Caroline in the city of Philadelphia on the 21st day of April, 1869.
The claim was disputed by Dr. Miles George, a half-brother, and others, descendants of another half-brother, and half-sister of the decedent, who denied that any such marriage had ever taken place, or if it had, that it conferred any title under the laws of Virginia, to the real estate of the decedent in Virginia, and they claimed to be the only heirs at law and distributees of the decedent.
John M. Pilcher, a tenant of William O. George at the time of his death, was indebted for rents, some of which were due at the death of said decedent, some fell due after his death, and another portion was payable at a future day. To recover the rents in arrear, Lee George, who had become the administrator of the personal estate of the decedent, sued out a distress warrant against Pilcher and levied it on his goods and chattels; and thereupon Pilcher filed his bill in the-circuit court of the city of Richmond against the rival claimants of the estate of William O. George, praying that they might be required to interplead and have their claims settled by the court, and offering to abide the judgment of the court touching the rent owing by him; he further prayed an injunction to stay all further proceedings on the distress warrant.
The injunction was granted, and an order made directing the parties to interplead and assert their respective claims.
*302 Caroline George, Lee George, and Willamin and wife at once filed their answers to the plaintiff’s bill, - asserting their claim,, which has been before stated, and at the same time filed a petition for the removal of the cause into the circuit court of the United States. The motion for removal was resisted by the other defendants, and was overruled. The other defendants did not file their answer until the 11th day of November, 1873, after all the depositions had been taken in the case.
In their answer they set up the claim on their part before stated, and controverted the claim of the other defendants. Whereupon the court directed the parties, the said Caroline George and the other Pennsylvania claimants, as plaintiffs on the one side, and the other parties as defendants on the other side, to proceed to trial before a jury on the following issue: “Whether the ceremony of marriage was duly solemnized between the said William O. George and the said Caroline, in the city of Philadelphia, in the state of Pennsylvania, on the 21st day of April 1869.”
The trial was had as ordered, and'resulted in a verdict for the defendants in the issue. The plaintiffs *■ moved to set aside the verdict, upon the ground that it was contrary to the evidence; which motion was overruled; and they excepted. Other bills of exceptions were taken to rulings of the court in the progress of the trial, which will be noticed further on.
The chancellor entered a decree approving the verdict of the jury, and, adjudging that the alleged marriage did not take place; that Miles George and the -other defendants in the issue were the lawful heirs of William O. George, deceased, and ordered payment of the rents to them. An appeal.from this decree, al *303 lowed to Caroline George and the other plaintiffs in the issue, brings the case here for review.
The first error assigned is the refusal of the court ■ below to order the removal of the cause into the circuit court of the United States.
The petition for removal was filed under the second section of the act of congress approved March 2, 1867. 14 Stat. at Large 558. An affidavit was filed according to the provisions of said act. The petition recited the affidavit, stated the cause relied upon for the removal, and was otherwise regular.
The record shows, that some of the defendants not uniting in the petition were also non-residents.
On motions for removal of two causes made in this court at the August term 1872, it was held, that where. there are several plaintiffs in a suit in a state court, some of whom reside in the state and some out of it, and all of the defendants reside in the state, the nonresident plaintiffs are not entitled to have the suit removed into the United States court under the act aforesaid. Beery & als. v. Irick & als. and Newton’s ex’or v. Bushong & als., 22 Gratt. 484.
Afterwards, at the October term 1878 of the supreme court of the United States, in a case which was the converse of the case in 22 Gratt. supra, that court held, that where the plaintiff and one of the defendants in a suit were residents of the state in which the suit was brought, and the other two defendants were non-residents, the non-resident defendants were not untitled to have the case removed under said act. Case of Sewing Machine Companies, 18 Wall. U. S. R. 553.
Mr. Justice Clifford, in the conclusion of the opinion of the court delivered by him, says: “Either the non-resident plaintiff’ or non-resident defendant may *304 remove the cause under the last named act (act of 1867), provided all the plaintiffs or all the defendants join in the petition, and all the parties petitioning are non-residents, as required under the judiciary act; but 'it is a great mistake to suppose that any such right is conferred by that act where one or more of the plaintiffs or one or more of the petitioning defendants are citizens of the state wherein the suit is pending, as the act is destitute of any language which can be properly construed to confer any such right unless all the plaintiffs or all the defendants are non-residents and join in the petition.”
This would seem to he conclusive against the petitioners in the case before us. The plaintiff, Pilcher, is a resident of this state, and all of the defendants are not non-residents, and all did not join in the petition.
But it was argued at the bar on behalf of the petitioners (the appellants here), that while the suit is in the name of Pilcher as plaintiff, against all the other parties as defendants, yet Pilcher is a nominal plaintiff; and that the suit is really and substantially a controversy between the petitioners on the one side, all of. whom are non-residents, and the other defendants on the other side; and the case must be considered as if it were a suit by the petitioners against the other defendants, or vice versa; and that if it does not come within the letter, it is at least within the spirit of the act of 1867.
This argument is plausible, but not sound. It is true that in a bill of interpleader proper the plaintiff claims nothing adversely to the defendants, and admitting that he owes a debt, or duty, or other thing, which is claimed from him by two' or more persons by different or separate interests, and that he is ready to render it, but not knowing which of the claimants has *305 the better right, to save himself from injury he prays that the claimants may be required to interplead and state their claims, and that the court may adjudge to whom the debt, duty, or other thing, belongs. Story’s Eq. Plead., § 291. '
y~ When the ease is matured, if the defendants do not deny the statements of the bill, the ordinary decree is, that the defendants do interplead; and the plaintiff withdraws from the suit. Story’s Eq. Plead., § 297.
But he cannot “withdraw from the suit,” we apprehend, until he has fully rendered the debt, duty, or other thing, required of him. Pilcher was ordered, by the decree directing the interpleader, to deposit in bank the amount of rents then due, and afterwards 11 from time to time” to deposit the accruing rents when due; and the like order was made as to other tenants. So that when the petition for removal was filed, Pilcher was still a, necessary party to the suit, and continued to be so; .and it does not appear that any order was ever made allowing his withdrawal from the suikj
But, even if it be conceded, that he was a mere formal party to the cause and his presence not necessary for the determination of the controversy between the defendants, and that this controversy between the defendants was substantially a suit between them within the meaning of the act of congress, still it would not •*be a case for removal under the act. For although the appellants, treating them either as plaintiffs or defendants in the controversy, were all non-residents and all united in the petition, yet all of the opposing parties were not residents of the state of Virginia. To authorize a removal under the act, as we understand it, all of the petitioning parties must be non-residents and all of the other parties must be residents of the state in which the suit is brought. See 18 Wall., supra, *306 and especially what Mr. Justice Clifford says on page 585.
It was further argued by the counsel for the appellants, that although the petition was framed under the act of 1867, it states a case which would authorize a removal under the act of July 27, 1866.. The last named act ápplies to a suit by a citizen of the state, in which the suit is brought against defendants, some one or more of whom are residents of the said state, and the other non-residents; and it allows a removal on the petition of the non-resident defendant or defendants as to him or them, “if the suit is one in which there can be a final determination of the controversy, as far as it concerns him (or them), without the presence of the other defendants as parties in the cause;” and it is expressly provided, that “such removal of the cause, as against the defendant petitioning therefor, into the United States court, shall not be deemed to prejudice or take away the right of the plaintiff to proceed at the same time with the suit in the state court as against the other defendants, if he shall desire to do so.”
If Pilcher is to be regarded as a plaintiff, and all the other parties as defendants, within the purview of this act, the appellants were not entitled to a removal of the cause for two reasons: 1. The controversy, so far as it concerns the appellants, could not be finally determined in the Federal court without the presence of the other defendants as parties in the cause. In fact, there is no real controversy between Pilcher (the plaintiff) and the appellants. The only controversy is between the appellants and the other defendants. Each party is asserting his own claim, and each contesting the claim of the other, and in such a controversy the claim of neither can be finally adjudicated in the suit *307 ■without the presence of the other as a party in the cause. Moreover, if the suit should be removed as to the appellants, and the Federal court should render a final decree in their favor, the chancery court of Richmond might at the same time proceed with the cause as to the remaining defendants, and render a final ■decree in their favor; and thus we should have the anomaly of a final decree in the same suit in favor of each of the opposing claimants to the same estate. 2. The act confers the right of removal on the nonresident defendants only, and all who are non-resident must unite in the petition for removal. Some of the non-residents in this case did not unite in the petition.
If, on the other hand, Pilcher is not to be considered •as a plaintiff, within the meaning of the act, and the controversy between the defendants is to be regarded as a suit between them, then as defendants only can have a cause removed under this act, we must regard the appellants as defendants, and the other parties as .plaintiffs. If so regarded, then plainly there would be no right of removal, because the appellants would be the only defendants, whereas the act provides for removal in suits where some of the defendants are residents of the state in which the suit is brought, and •others are non-residents.
It appears clear to us, therefore, that in no aspect of the ease, were the appellants entitled either under the ■act of 1866 or under the act of 1867, to a removal of the cause into the circuit court of the United States, •and that the prayer of their petition was properly denied.
We proceed to consider the several objections presented by the bills of exceptions taken to the rulings of the court on the trial of the issue.
The court, notwithstanding objection made by the *308 plaintiffs, permitted the defendants to read in evidence to the jury the deposition of Joseph Mayo, who was dead at the time of the trial. The witness in his deposition detailed a conversation which was had between himself and one of the defendants Lee George, in the-presence of Constant C. "Willamin, (another of the-defendants), soon after the death of William O. George, in which conversation Lee George was represented as-having made important admissions, touching the disputed marriage, which was the only question to be determined by the jury on the trial of the issue. Those two defendants were strangers to the witness,, and on cross-examination, describing them, he said, “ They were not black negroes. I think the brother-in-law had the lightest skin of the two. I think they were not bright mulattoes, but dark mulattoes.” It was proved by other witnesses, that the brother-in-law spoken of (Willamin) was a white man, and that Lee George was so bright that he could hardly be distinguished from a white man. It was further proved that about the time at which Mayo says he had the interview with the two men, Lee George and Willamin were both in Bichmond inquiring for Mayo. The reading of the deposition as evidence was objected to-because the witness did not sufficiently identify the parties whose admissions were sought to be proved by him. We think the deposition was properly admitted. The evidence of identity was prima fade sufficient to-authorize the deposition to go to the jury. 1 Green-leaf on Ev. § 575 and notes, and cases cited by counsel' for appellees, Reynolds v. Staines, &c., 2 Carr and Kirwan 745, 61 Eng. C. L. 744; Hamber v. Roberts, 7 Man. G. and S. 861, .62 Eng. C. L.; Collier v. Nokes, &c., 2 Carr and Kirwan, 1012, 62 Eng. C. L. 1011.
As it is more convenient we will dispose of the *309 ■question raised by the third bill of exceptions taken by the appellants before noticing the second.
The question will be more fully presented and .better understood by copying the bill which is in these words': ;
Be it remembered, upon the trial of this cause, after plaintiffs and defendants had closed their evidence, and C. White, Esq., (one of the counsel .for the plaintiffs) was proceeding to address the jury, and was arguing that by a proper construction of Byrd George’s will, his son (W. O. Geoi’ge) could not have disposed of the property by his will, being unmarried, here the counsel for the defence asked leave to introduce in ■evidence three deeds, viz: W. O. George to W. P. Goodman, dated December 15th, 1862; the same to A. P. Rowe, dated June 6th, 1863; and the same to Henry White, dated June 13th, 1862. The plaintiffs •objected, but the court admitted the deeds after said White and Holladay had spoken (the deeds were made a part of the record), with the declaration that the said ■counsel who had spoken might, if they thought proper, comment on the said deeds, inasmuch also as the •purpose for which the will of Byrd George was introduced was not disclosed until the argument began; to which opinion of the court the plaintiffs excepted, and prayed that this their bill of exceptions may be signed, ■sealed and enrolled. Which is accordingly done.
The deeds referred to in the bill of exceptions purport to convey in fee to the grantees lands devised by the will of Byrd George to his son Wm. O. George, and although the object for which they were offered as evidence does not distinctly appear by the bill, yet it sufficiently appears that they tended to show that the *310 construction put upon the will by the plaintiffs’ counsel was not the construction given to it by W illianu O.. George; and the deeds were therefore competent evidence to rebut the inference drawn by the counsel from their construction of the will. It would seem that the objection was rather to the time of the introduction of the evidence than to its competency. On-trials before a jury, when the evidence has been closed' on both sides and the argument of the cause has commenced, as a general rule, no further evidence should be'received from either party; but the judge presiding at the trial, in the exercise of a sound discretion, may relax the rule under peculiar circumstances, and receive additional evidence, if the nature of the casé and the ends of justice require it., But if the introduction of such additional evidence takes the adverse party by surprise, he should be allowed time and opportunity, if desired, to meet it with further evidence on his side. Commonwealth v. Ricketson, 5 Metc. (Mass.) 428-9; Taylor &c. v. Shemwell, 4 B. Monr. R. 575; Fleck &c. v. Hollenkemp, 13 B. Monr. R. 219; Larman v. Huey’s heirs, Id. 436; McDowell’s ex’or v. Crawford, 11 Gratt. 377, 408-9.
It does not appear that the introduction of the deeds in this case took the plaintiffs in the issue by surprise, or that their rights were at all prejudiced thereby. They did not claim that the admission of the deeds rendered any further evidence on their part necessary, or that they had any such to offer, nor did they ask for any delay, or postponement of the argument, or of the trial, on account of the introduction of the deeds.
We think the court committed no error in permitting the deeds to go in evidence to the jury.
In the course of the trial, after the plaintiffs in issue *311 had read to the jury the depositions of Charles Mink and others, and, amongst other exhibits accompanying the depositions, the certificate of marriage of William ■ O. George and Caroline Jackson, and there rested their case, and the defendants had introduced sundry witnesses who testified in their behalf, and the plaintiffs had closed with their rebutting evidence, they (the plaintiffs) offered to read to the jury the depositions of eighteen witnesses, to prove that the said Charles Mink (whose deposition had been read by the plaintiffs in evidence to the jui’y) “was a man of good character for truth and veracity, and a man of the strictest integrity.” To the introduction of these depositions as to the character of Mink, the defendants objected, the objection was sustained, the depositions were excluded; and the plaintiffs excepted. Were the depositions properly excluded, is the question for us to determine, and the one mostly argued at the bar.
A witness may be impeached in many ways. “ The credit of a witness may be impeached,” says Mr. Starkie, “either by cross-examination, subject to the rules already mentioned, or by general evidence affecting his credit, or by evidence that he has before done or said that which is inconsistent with his evidence on the trial; or lastly, by conti’ary evidence as to the facts themselves.” 3 Starkie on Ev. (Metcalf’s ed.), side page 1753. See also 1 Greenleaffs Ev., §§ 461, 462; Phillips’ Ev., pp. 291, 293.
When a witness is thus impeached, the party calling-him has the right to sustain him, and for that purpose it would seem but just and reasonable that he should be allowed to introduce evidence of the general reputation of the witness for truth.
All the authorities concur, that such corroborating evidence is admissible where the character of the wit *312 ness is attacked by direct evidence; but there is much conflict among them as to its admissibility where the is made in any other mode. The rule is laid down by the elementary writers in general terms thus: ^ Party cannot bring evidence to confirm the character of a witness before the credit of that witness has been impeached, either upon cross-examination or by the testimony of other witnesses; but if the character of a witness has been impeached, although upon cross-examination only, evidence on the other side may be given to support the character of the witness by general evidence of good conduct. 1 Starkie Ev., Metcalf’s edi., side page 148. If the character of any witness for credibility be impeached, either by direct evidence or upon cross-examination, his testimony may be supported by general evidence that his character is such that he is worthy of credit. Roscoe Crim. Ev., 95.
In answer to the evidence of contradictory statements, and for the purpose of corroborating the testimony of the witness whose veracity has been thus impeached, it seems reasonable to be allowed to show that he is a man of the strictest integrity and of scrupulous regard to truth. 1 Phillips on Ev., 806, 807.
See 1 Greenleaf’s Ev., § 469 and notes (Redfield’s edition).
Many of the decisions in the American states hold, that the. evidence is admissible only when the general character of the witness, or his character for truth, is assailed by direct evidence as to such character, or by proof on cross-examination of extrinsic facts going to general character; and that it cannot be received to sustain a witness on account of inconsistencies in his own statements on cross-examination, or on account of statements proved to have been made by him out of court contradictory of statements made by him *313 in court, or on account of proof by other witnesses of material facts irreconcilable with the facts proved by the witness, although such proof may impute fraud or falsehood to the witness. People v. Hulse, 3 Hill’s R. 309; People v. Gay, 3 Selden’s R. 378; Russell v. Coffin, 8 Pick. R. 143; Rogers v. Moore, 10 Conn. R. 13; Brown v. Mooers, 6 Gray’s R. 451; Heywood v. Reed, 4 Gray’s R. 574; Atwood &c., v. Dearborn, 1 Allen’s R. 483; Boardman v. Woodman, 47 New H. 120; 9 Watt’s Penn. 124; Wertz v. May, 21 Penn. St. R. 274.
Other state authorities, however, lay down a much more liberal rule. In the case of Paine ond others v. Tilden and others, 20 Verm. R. 554, Judge Redfield says: “It is now well settled, that whenever the character of •a witness for truth is attacked in any way, it is competent for the party calling him to give general evidence in support of the good character of the witness. And we do not think it important whether the character of the witness is attacked by showing that he has given contradictory accounts of the matter out of court, and different from that sworn to, or by cross-examination, or by general evidence of want of character for truth.” State v. Rowe, 12 Verm. R. 93; Sweet v. Sherman, 21 Verm. R. 24, accord.
In Tennessee, in a case in which a witness had been subjected to a severe cross-examination, with a view to impair his credit, and general evidence of character had been offered to sustain him, which was objected to, Green, J., in delivering the opinion of’the supreme •court, said: “ The record shows that Hamilton was ■subjected to a searching cross-examination by defendants’ counsel, in which many questions were asked as to the situation of the building, his motives for being in the place where he witnessed the facts, to which he *314 deposed, &e., all going strongly to evince that no credit was given to his statements, and tending to make that impression on the jury. A witness may be impeached by proving that he is not worthy of credit, or that the facts to which he deposes are not true, or by cross-examination, in which he may be involved in inconsistencies. 3 Starkie 1753, 7, 8. In this case, the cross-examination was of a character from which the counsel manifestly intended to argue that the witness had sworn falsely.” Richmond v. Richmond, 10 Yerg. R. 343.
In a case in Alabama, where evidence was adduced to contradict a wituess on an immaterial point, the party who called him was allowed to introduce witnesses to-sustain his general character, although the opposite-party disclaimed any intention' of discrediting him.. Newton v. Jackson, 23 Alab, R. 335.
And in North Carolina, in a case decided in 1869 by the supreme court of that state, it was held competent to sustain a witness by evidence of character, where it was sought to impeach him by the very questioñ put to him. State v. Cherry, 63 North Car. R. 493.
The most recent case coming under our notice, in which this question was considered, is one decided by the court of appeals of Maryland at the April term 1873.
Judge Robinson, delivering the opinion of the court, said: “ Mere contradiction among witnesses furnishes no ground, as a general rule, for admitting general evidence as to their character; though if fraud or other improper conduct be imputed to any of them,. such evidence will be received. Annesley v. Arglosia,. 17 How. St. Trials, 1348. The credit of a witness,, however, may be impeached by evidence assailing his-character for veracity; or by proof of contradictory- *315 statements in regard to the material facts; or by disproving by other witnesses material facts stated by him in his direct or cross-examination. Here the pur-_ pose of the state was to discredit the witness Harrison, by disproving material facts testified to by him, and it was competent, therefore, for the prisoner to sustain the witness by proof of his general character for veracity.” Davis v. Slate, 38 Mar. R. 15.
Ve are not aware that the precise question passed upon by these decisions, has ever come before this court for determination until now, and in the conflict of authorities in other states, we are called upon to declare the true rule in Virginia; and we are of opinion, that whenever the character of a witness for truth is attacked either by direct evidence of want of truth, or by cross-examination, or by proof of contradictory statements in regard to the material facts, or by disproving by other witnesses material facts stated by him in his examination; or, in general, whenever his character for truth is impeached in any way known to the law, the party calling him may sustain him by evidence of his general reputation for truth. The rule as we declare it, has, we believe, been generally' regarded as the true rule by the bench and the bar in this state, and has been generally followed in the-practice.
We proceed to inquire whether under this rule the character of the witness Charles Mink was impeached in any way in the .proceedings in the court below, so as to make it” proper to let in the evidence of good character which was offered to sustain him and which was excluded. Ho direct evidence of character was given with a view to impeach him, nor were any con-contradictory statements made by him proved. If he was impeached at all, it was in some other way.
*316 The only question presented by the issue and to be determined by the jury, was, whether or not a marriage between William O. George and Caroline Jackson had been duly solemnized in the city of Philadelphia on the 21st day of April 1869. The main witness relied on by the plaintiffs in the issue to prove the marriage, was Charles Mink, an alderman of said city. In his examination in chief, he testi4es that as aider-man he solemnized the marriage between William O. George and Caroline Jackson, in the city of Philadelphia, on the 21st day of April 1869, and on the same day and after the marriage, he made out a certificate of the marriage, signed it in his official character, caused it to be attested by a witness, John Garrigan, or Gogran, and delivered it to the said Caroline, and the certificate, which is a part of the record, being produced, he identified it as the one made out and signed by him on the 21st day of April 1869; and that he afterwards made return of the marriage to the proper office in the city of Philadelphia. It was proved by other witnesses, and not doubted, that according to the laws of Pennsylvania, aldermen are ■vested with the power to solemnize marriages in that state. How if this testimony of alderman Mink is. true, the marriage was fully proved, and hence all the evidence adduced by the defendants was to prove that it was not true.
The witness was subjected to the most searching cross-examination, and no man can read it without being satisfied that the main object and purpose of it was to impeach the credibility of the witness. This design is patent from the character and form of the questions put to him, and from the whole course of the examination. He was particularly interrogated as to the time and place of the marriage, the number, *317 names and description of the persons present at the ceremony. He was asked if he kept any record in a hook of the marriages celebrated by him, and if so, to ' produce the book. The witness- having replied that he had kept such a book, but when he went out of office he gave all Ms records to his constable to be sold for old paper, and therefore he could not produce the book; he was then asked who that constable was, and if he did not know before he went out of office that there was some dispute about the marriage? The witness answered that he did know it. He was then asked why he did not preserve the marriage book. He was further interrogated as to the number of marriages recorded in that book, the names of the parties married, and the times at which the entries were made, how many before and how many after the entry of the marriage of William O. George and Caroline Jackson? The witness having testified that besides Gogran there was a colored man present at the marriage; he was asked why he did not make this colored man awitness to the ceremony as well as Gogran or Garrogan, and whether he had ever on any previous marriage occasion put the name of a witness of the ceremony on his book? Many other questions of like character were propounded on the cross-examination, and in the course of it, in the questions propounded, the marriage is spoken of as the “alleged marriage,” the parties married as the “alleged parties,” and the entry by the witness as the book kept by him of the marriage as the “alleged record,” &c. But we have said enough to show that the intent and object of the cross-examination was to discredit the witness before the tribunal in which 'the deposition was to be read.
It was further attempted to discredit him by showing by another witness, George E. Chambers, that the- *318 statement made by him, Mink, about the refusal of the registration officer to receive returns of marriages ■ made by him was not true.
In fact all the evidence offered by the defendants to disprove the marriage, to which Mink testified, went to discredit him. Such of necessity was the effect of the evidence offered to show the declarations of William O. George, after the date of the alleged marriage, that he had never been married, and evidence of the like character.
We are clearly of opinion that the corroborating evidence offered by the plaintiffs, and which was excluded, should have been received. The defendants denied from the beginning, that any marriage between William O. George and Caroline Jackson had ever taken place, and this denial of necessity involved the character of Mink, by whom the marriage was attempted to be proved. Indeed, after his deposition had been taken and filed, the defendants in their answer to the bill, after speaking of the marriage, and the certificate of it, use this language: “And upon investigation these defendants have discovered that the said certificate of marriage was a base fabrication, concocted after the death of the said William O. George, and the discovery that he had died intestate, and the result of a conspiracy on the part of the said Caroline •and her children aud Willamin, in which they procured the help of the said alderman, one Mink of Philadelphia, to cheat these defendants and Ella Ferguson, the heirs of the said William O. George, of his estate, and possess themselves of it.” Such was the charge in the answer, which, although not read in evidence to the jury, was substantially repeated by the counsel for the defendants in the opening statement of the case to the jury; for it appears by the certificate of the chancellor, *319 presiding at the trial, that “ in the opening statement of the case to the jury the defendants’ counsel assailed the certificate of marriage of William O. George to ■ Caroline Jackson by alderman Mink as false and fraudulent, and repeated it throughout.
The attempted disproof of the marriage and of the certificate given by Mink was a charge upon the record and before the jury that Mink was guilty of fraud, conspiracy, forgery and perjury; and if the party calling a witness who is thus attempted to be impeached cannot sustain him by evidence of good •character for truth, we cannot conceive of a case where such evidence would be admissible. The certificate of the chancellor, that “there was no evidence impeaching the character of the witness, alderman Charles Mink,” must be understood as referring only to direct evidence as to character.
It is needless to say much as to the refusal of the chancellor to set aside the verdict of the jury and order a new trial of the issue. He did not certify the facts, because the evidence was conflicting; and there is no certificate of the evidence. Some of the evidence given is shown by the bills of exceptions in the case, from which it also appears that other evidence was given; but what that evidence was does not appear. If there had been no error in rejecting the corroborating evidence offered by the plaintiffs, in the absence of any certificate either of the evidence or of the facts proved by it, there would have been no error in the chancellor’s decree. But for the error committed in excluding the corroborating evidence aforesaid the decree must be reversed and annulled, and a new trial of the issue directed.
The decree was as follows:
*320 This day came again the parties by their counsel; and the court, having maturely considered the transcript of the record of the defcree aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that on the trial by the jury of the issue ordered by the said chancery court of the city of Richmond on the 11th day of November, 1878, the said court erred in excluding as evidence from the jury the deposition of Joseph Clittermary and others, offered by the plaintiffs in the issue-to sustain the character of the witness Charles Mink,, whose deposition had been read by said plaintiffs in evidence to the jury; and that the whole of the decree aforesaid based upon the verdict of the jury rendered on said trial, except such part thereof as relates to the appointment of the receiver therein mentioned and the directions given to such receiver, is erroneous. It is therefore adjudged, ordered and. decreed, that the said decree, so far as it is hereinbefore declared to be erroneous, be reversed and annulled, and that the same be affirmed in all other respects; and that the appellees (except John M. Pilcher) pay to the appellants their costs by them expended in the prosecution of their said appeal here. And this court'proceeding to-pronounce such decree as the said chancery court ought to have pronounced, it is further adjudged, ordered and decreed, that the verdict of thé jury rendered on the trial of the issue aforesaid be set aside,-and that the parties in said issue proceed again to the’ trial thereof at the bar of said court, and upon said trial that the said court proceed in conformity with the opinion hereinbefore expressed. Which is ordered to be certified to the clerk of the said chancery court of the city of Richmond.
Decree reversed.