## Richmond

Richard Breeding, Administrator, Etc. v. Harold Johnson.

March 4, 1968.

Record No. 6533.

Present, All the Justices.

*Hugh P. Cline; Carl E. McAfee (Cline & McAfee,* on brief), for plaintiff in error.

*Francis W. Flannagan (Woodward, Miles, Davis & Flannagan,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

This action was instituted by Richard Breeding, Administrator of the estate of Richard Wayne Breeding, deceased, against Harold Johnson, by motion for judgment, seeking recovery of damages for the death of his decedent, alleged to have resulted by reason of the negligence of defendant.

In his grounds of defense, defendant denied that he was the driver of the automobile which was involved in the accident, resulting in the death of plaintiff's intestate. Plaintiff moved to strike so much of the grounds of defense as concerned the operation of the vehicle for the reason that it was not accompanied by an affidavit. Defendant thereupon filed affidavit that he had no memory of the day of the accident and that insofar as he knew, or was able to determine, he did not drive, operate or control the automobile involved in the accident. Plaintiff moved to quash the affidavit upon the ground that it did not comply with Code § 8-115, which motion was overruled.

The case was tried before a jury which returned a verdict in favor of defendant. Plaintiff's motion to set aside the verdict was overruled, judgment entered on the verdict, and plaintiff thereafter obtained this writ of error.

In his brief, plaintiff argued that "the real issue" in the case was that of the identity of the driver of the automobile, and in this we concur. He has made numerous assignments of error; but we deem it necessary to discuss only those which concern the identity of the operator of the automobile involved in the fatal accident, and the action of the trial court regarding the affidavit and in admitting and refusing to admit certain evidence.

Richard Wayne Breeding was killed about 2:30 P. M. on December 24, 1965, when an automobile in which he and Harold Johnson were

the only occupants crashed into a large ten-ton cement mixer which was parked on the left edge of U. S. Highway 58-A. The collision occurred six miles east of St. Paul, Virginia, at a place known as Lawson's Store. The automobile involved was a yellow, 1965 Pontiac GTO, equipped with a high performance engine, owned by Breeding, who sometimes engaged in racing at "drag strips".

Johnson is a teacher in the Dickenson County Public Schools. Breeding was an employee of Appalachia Power Company. The two men were friends and for over a year prior to the accident had jointly operated a small business known as The Lone Star Restaurant located 2.4 miles east of Lawson's Store. On the date of the accident, the restaurant was the scene of a small gathering which consisted of Johnson, Breeding, two of their employees and several other friends. A few minutes prior to the accident, Breeding and Johnson decided to drive to St. Paul. When they left the restaurant, Johnson was driving Breeding's car. This was established by the testimony of two witnesses, Charles Suits, owner of a service station located 150 feet west of the restaurant, and Hartford Garrett, who was at the service station at the time. When the automobile passed Suits and Garrett en route west to St. Paul, the occupants waved to Suits, and he returned their greetings. The car was seen next by J. W. Cassell, a farmer who lives on Route 58-A near Lawson's Store. He and his wife were standing about 25 feet from the highway when he heard the yellow Pontiac approaching at such a speed, and making such an unusual sound, that he turned and watched it for approximately a quarter of a mile. He described the speed of the car as "terrific . . . the maximum that it was possible for it to do. I would say well over a hundred miles an hour". He said that when the car was about 200 feet from his driveway, the driver seemed to lose control; that ". . . the right rear got over on the (right) shoulder . . . the rear end of the car commenced getting ahead . . . made a complete circle, and the rear end caught on the left shoulder of the highway and the car seemed to straighten up then"; and that it had created such a cloud of dust that he could not see what happened thereafter but heard the car crash into something. He went to the scene and found the car had been wrecked. One man (Johnson) was still in the vehicle, and the other (Breeding) was lying under the right edge of the car. Cassell stated that it was necessary to raise up the right side of the car to pull Breeding out from under it. He did not recognize the parties in the car when it passed by him.

Roger Wyatt was sitting in a parked vehicle about 20 feet west of

Lawson's Store when he saw the Pontiac automobile approaching, and described it as a ". . . yellow streak . . . scooting up the highway . . ." He stated that he heard the tires scream; that the car was scooting up the highway sideways in the gravel until it hit the cement mixer and knocked it toward St. Paul; and that he estimated the speed of the car as ". . . doing well over a hundred miles an hour". Wyatt went immediately to the wreck and helped remove Johnson, who was lying unconscious inside the car between the bucket seats with his face down to the floor and his feet under the dash. This witness testified that he did not see anyone fall out of the car before the impact; that he helped lift the vehicle up and someone pulled Breeding out from under it; that Breeding had blond hair; that he noticed blood on the dash, on the right side of the automobile above the door, and on a quarter panel post; and that he also observed light colored hair and flesh on the same places. When asked if he noticed any blood on Johnson, Wyatt said "Not as [sic] cut, but I noticed a few bruised spots on his face". He said Johnson's hair was light brown.

Fred Hagy, a body and fender repairman, testified that "on the right windshield post and right assembly eye at the top and the vent wing assembly, there was presence of flesh and blond hair and was some blood; hair and flesh on the drip rail".

Trooper Vance Richardson arrived at the scene about thirty minutes after the accident. He testified that skid marks made by the Pontiac began 465 feet east of the point where the car ultimately came to rest; that the marks began on the right side of the road and led to the left; that the cement mixer, weighing approximately ten tons, had been turned over and around, and apparently was 21 feet from where it was located prior to being hit; that it was resting between the highway and the car, which had come to rest on the left side of the road; and that the skid marks apparently were made by the vehicle going "sideways". Pictures of the vehicle and the scene were introduced through this witness, and they show that the car was caved in at the top of the right quarter panel, with the whole right side practically torn off. There was little damage to the left, front or rear of the vehicle. The trooper described the highway as upgrade for approximately one mile as one approaches Lawson's Store from the east.

Plaintiff called Wendell Burroughs, the undertaker who attended the body of plaintiff's intestate. He was asked, "Will you state to the Court and jury the general description of the physical damage,

injury to his body?" At this time, the following exchange occurred between counsel and the court:

"Mr. Flannagan: Your Honor, we are going to object. This is a death case. There could be no general description.

"Mr. Cline: It is proper in showing the type of mutilation to the body.

"The Court: I think you can show he was killed.

"Mr. Cline: What I wanted to show was the area of the skull, that to be connected up with flesh found upon the car.

"Mr. Flannagan: There is no foundation for that.

"The Court: I think you can't do that until you lay the foundation.

"Mr. Cline: I will have him step aside and prove that by another witness."

Thereafter, and following the testimony of Fred Hagy, Burroughs was recalled and asked this question: "I'll ask would you state what you observed from your professional capacity of any damage done in the head area of Richard Wayne Breeding?" Defendant's objection to this question was sustained, and plaintiff excepted. Counsel for plaintiff then asked Burroughs, "Were there any wounds to his head?" Again, defendant's objection to the question was sustained, and plaintiff excepted.

In the absence of the jury, and for the record only, Burroughs testified that Breeding's hair was blond; that he sustained damage to the head area; that the flesh and hair were disturbed in that the left side of Breeding's head was crushed, resulting in brain tissue and other tissues coming out; and that there was some hair missing.

Defendant's testimony was that he had no recollection of the accident or any of the events that occurred on December 24, 1965.

[1] A stipulation was introduced in evidence that if Dr. C. F. Johnson, Jr., of Abingdon, had been present, he would have testified that he treated Harold Johnson following the accident and that:

"The diagnosis was
"1. Pneumothorax, right;
"2. Multiple rib fractures, right;
"3. Head injury, severe, with right paralysis;
"4. Shock, severe;
"5. Lacerations and avulsions, scalp."

\* \* \*

"He was seen as an out patient on April 1, 1966, still having some

difficulty walking and at his insistence I allowed him to go back to substitute teaching. He was mentally clear and I do not believe he has much mental deterioration. However he was unable to remember recent events; he did not remember the accident or most of the time in the hospital. In my opinion this is perfectly normal, as recent memory is often lost; but memory from his education remains in this type of amnesia."

Prior to the introduction of this stipulation, counsel for plaintiff objected to the diagnosis portion of the statement. In stating his objection, he referred to the burden on plaintiff to prove identity of the driver of the automobile, and this he hoped to do, partially by presenting evidence of the damage to the automobile, of where the body was after the impact, and of the damage to portions of the body whereby it could be connected with any physical facts present in the automobile. He invited the court's attention to the evidence of flesh, blood and hair upon the right corner post of the automobile, and of his attempt to show that decedent had flesh and hair torn from his head; and of the fact that he was prevented from doing this by the ruling of the court. Counsel objected to the diagnosis of the doctor for the reason that the jury might infer therefrom that the flesh on the automobile could have come from Johnson, or that Johnson's rib might have been fractured on the right corner post. He argued that defendant should not be permitted to show a detailed diagnosis of his injuries, in view of the ruling of the court on the testimony of Burroughs. His objection was overruled and he excepted.

It was not error for the court to have admitted evidence offered by defendant to explain his inability to testify regarding the accident. Defendant suffered amnesia and was entitled to explain the reason for his loss of memory. Under the circumstances of this case both the diagnosis and conclusion of the physician were admissible. However, the form of the stipulation which detailed Johnson's injuries made the evidence offered by plaintiff through witness Burroughs all the more pertinent.

[2] The objection of plaintiff to the affidavit filed by defendant is without merit. Code § 8-115 provides that in any pleading wherein a person is alleged to have operated an instrumentality, no proof of the fact alleged is required unless an affidavit be filed putting it in issue, denying specifically and with particularity that such instrumentality was, at the time alleged, so operated. The statute is remedial and its purpose is to relieve the plaintiff of proving more or less formal matters. In the instant case, plaintiff alleged that Johnson

drove the Pontiac automobile that was involved in the accident. Johnson made an issue of this allegation by the filing of an affidavit, and having no recollection of the accident, necessarily based it on information and belief. This was sufficient to put plaintiff on notice that the operation of the vehicle was to be an issue.

[3] Defendant, by his grounds of defense and affidavit, in effect framed the issue that dominated the trial of this case, for it thereupon became the responsibility of plaintiff to prove the identity of the operator of the vehicle in which his intestate was killed. In *Kavanaugh* v. *Wheeling*, 175 Va. 105, 112-113, 7 S. E. 2d 125, 128, we said:

"In Virginia, we have followed the rule adopted by the great weight of authority that in an action for injuries caused by the negligent operation of an automobile proof that the automobile was owned by the defendant establishes a prima facie case that the automobile was being operated by the defendant or someone for him, under circumstances making him liable therefor. However, this is merely an inference or presumption that may be rebutted, with the burden of overcoming it resting upon the defendant . . ."

The inference or presumption that the owner of a vehicle, or someone for him, was its operator is a *prima facie* presumption and one that cannot stand in the face of positive facts to the contrary. Plaintiff sought to overcome this presumption by testimony of eyewitnesses and circumstantial evidence. He proved that when the Pontiac automobile left the restaurant it was being driven by Johnson, and that Breeding was sitting on the right side of the front seat. So far as the printed record discloses, no one else saw the car until it approached Lawson's Store, and there is no evidence to indicate a change of drivers.

The speed of the car was established by two witnesses to be in excess of 100 miles an hour. At that speed, it would have taken the parties less than two minutes to have traveled the 2.4 miles from the restaurant to Lawson's Store. The manner in which the vehicle was being operated, and its speed, is further shown by the distance it traveled after it got out of control, the distance it knocked the concrete mixer, and the damages to the mixer and to the car. After the wreck, the body of Breeding was found immediately under the right side and door of the car.

[4] Breeding had blond hair and suffered extensive head injuries in the accident. Blood, blond hair and flesh were found on the dash, on the right side above the door and also above the quarter panel post,

the area where Breeding was sitting when last seen. Witness Wyatt testified regarding the hair, flesh and blood being found in the vehicle, as did witness Hagy. Without the testimony of Wendell Burroughs, there is no evidence in the record that the decedent suffered any injury which caused him to lose any blood, hair or flesh. It was to supply this link in the chain of evidence that plaintiff offered the testimony of Wendell Burroughs, and it was relevant under the circumstances. This testimony became more critical by subsequent introduction of the diagnosis of defendant's condition by Dr. Johnson.

Accordingly, we conclude that the court erred in refusing to admit the testimony offered by plaintiff showing that the decedent Breeding suffered injuries of such a nature as to have caused the loss of blood, flesh and hair.

In Virginia the general rule is that:

"Error will be presumed prejudicial unless it plainly appears that it could not have affected the result. A plaintiff in error must always show, not only error in the rulings of the trial court, but also error of a substantial nature. When once he has pointed out an error of a substantial character, he is entitled to have it corrected if it appears from the record that there is reasonable probability that it did him any harm. There is no presumption that error is harmless." 1B Mich. Jur. *Appeal and Error* § 293, p.426. See *Spence* v. *Miller*, 197 Va. 477, 482, 90 S. E. 2d 131, 135; *Joyner* v. *Commonwealth*, 192 Va. 471, 477, 65 S. E. 2d 555, 558.

We are unable to say that the refusal of the court to admit the testimony of Burroughs was harmless error.

This is especially true since the trial court must have concluded from the evidence that was admitted that plaintiff had not overcome the *prima facie* presumption that his intestate, the owner of the vehicle, was also the driver, for in five of the seven instructions granted by the court some reference is made to the identity of the driver of the vehicle.

[5] In view of our decision and the possibility that this case may be retried, we think it appropriate to observe that in an action for death by wrongful act, the measure of damages is the pecuniary loss, if any, sustained by the beneficiaries; compensation for their loss of the decedent's care, attention and society, and for their solace and comfort for the sorrow and suffering occasioned by the death of a decedent. Evidence regarding the magnitude and seriousness of the injuries of a decedent, the extent of the mutilation of his body, and other circumstances likely to inflame or prejudice a jury, or invite

its sympathy, should not be admitted. In this case, evidence of the type offered is admissible here for the sole reason that it has relevancy in establishing the identity of the driver. It should be restricted to a showing that the decedent's injuries were such as could have resulted in the deposit of hair, blood and flesh found in the vehicle and testified to by witnesses. Appropriate questions to accomplish this limited purpose can be framed and propounded under the guidance of the trial court.

Because of the refusal of the court to admit in evidence the testimony of Wendell Burroughs, the judgment is reversed; the verdict of the jury is set aside; and the case is remanded for a new trial.

*Reversed and remanded.*