### CITY OF STAUNTON v. RALPH W. E. ALDHIZER, ET AL.

March 8, 1971.

Record No. 7328.

Present, Snead, C.J., I'Anson, Carrico, Gordon, Harrison and Harman, JJ.

*Stuart H. Dunn, Assistant Attorney General* (*Andrew P. Miller, Attorney General; Robert A. Johnson, Assistant Attorney General; Benham M. Black; Lotz & Black,* on brief), for plaintiff in error.

*Wayt B. Timberlake, Jr.* (*Timberlake, Smith and Thomas,* on brief), for defendants in error.

HARRISON, J., delivered the opinion of the court.

The City of Staunton filed its petition in the court below seeking to condemn 0.001 acres of land, a temporary easement over 0.039 acres and three buildings situate on the residue, owned by the defendants, Ralph W. E. Aldhizer and Eleanor M. Aldhizer. The land and easement were necessary for the improvement of Richmond Avenue, embraced in the Virginia Highway system as Route 250.

The area sought in fee contained 44 square feet, it being a part of a 5600 square foot lot owned by the defendants located at the northeast corner of Richmond Avenue and Powell Street. The city filed a certificate of deposit in the amount of $13,774 representing its estimate as to the value of the property involved and damages.

By the time the matter was heard, the buildings on the property had been removed and the landowners had constructed a one-story block building designed to be utilized exclusively as a grocery store. This replacement building was located on the lot some distance farther from Route 250 than the original structure.

On November 2, 1968, the commissioners, after hearing the evidence and viewing the premises, including the new grocery store thereon, awarded the landowners $22,500, of which $22,000 represented the value of the land, buildings and temporary easement, and $500 represented damages to the residue. The city filed exceptions which were overruled and final judgment was entered by the trial court, which action the city appealed.

The dispositive issue is whether or not the court erred in allowing the landowners, over the objection of the city, to testify as to expenditures they made in constructing their new grocery store, and further, if such action, although improper, constituted harmless error in view of the fact that the commissioners allowed only $500 as damages to the residue.

The most substantial loss suffered by the landowners was occasioned by the removal of their two-story frame building, the first floor of which was being utilized by them as a grocery store and the second floor as a rental apartment. This building was located immediately adjacent to the south edge of Route 250 and its porch or steps encroached somewhat on the highway right-of-way. Prior to the reconstruction of Route 250 as a divided highway, the city permitted parking in front of the old building.

The two-story building was on a lot which was level where the building was erected and then sloped sharply upward to the rear line.

Persons using the grocery store or first floor entered from the front and at ground level. Access to the upstairs apartment or second floor was from the rear of the building.

A diagram shows that its first floor fronted on the south side of Route 250 a distance of 34 feet, and ran back therefrom between parallel lines along the east side of Powell Street a distance of 40.2 feet. Attached to the east side of the store was a frame one-story room, 12 feet x 25.7 feet, used for storage, a hot water heater and compressors. Across the front of the main building was a frame two-story open porch, 8 to 9 feet wide. Attached to the rear of the building was a small 5.9 x 18.7 foot stoop or open porch. The main building and porches were covered with a metal roof. The garage computed to 127 square feet and the shed to 56 square feet. The Aldhizers had operated on the site a small grocery store business for a period of years, and had purchased the property in 1960.

In his opening statement counsel for defendants advised the commissioners that his clients had spent approximately $20,800 in the construction of the new grocery store, and he felt that under the court's instructions it would be proper for them to consider, aside from the value of the property taken, the reasonable and proper expenses to which the Aldhizers had been put in seeking to adapt the residue of that property to the usability that it had before the taking. Aldhizer was permitted to testify, over the objection and exception of the city, that he had constructed a new grocery store at a cost to him of $20,800, describing the store, where it was located and the ventilation installed therein. This evidence was allowed to show what the Aldhizers had done to adjust the residue of their property, after the buildings were taken, to the new conditions.

In 27 Am. Jur. 2d *Eminent Domain* § 314 (1966) is found the following statement on "Necessary expense to adapt remaining land to changed conditions or make it usable":

"Where part of an owner's property is taken for a public use, the owner may be damaged from inability to make the most advantageous use of the remaining land without additional expense. Generally speaking, in determining the diminution of the market value of the land not taken or the damages thereto, it is proper to consider the expense made necessary by reason of the improvement in order to restore the remaining land to a condition that will make it available for the most advantageous use, or for adjusting the property to the changed conditions brought about by the tak-

ing. Thus, the cost of restoring the remaining land to a condition that will make it available for use, if restoration is a reasonable and proper method of meeting the damage caused by the taking, is an element that may be considered in determining the compensation. However, severance damages do not include the cost of bringing the remaining land into the same function as that for which the entire tract was used before the condemnation. Thus, it is held that where a condemnee recovered the market value of improvements on the part taken, he is not entitled to recover the value of improvements which would have to be erected on the remaining land in order to continue the business conducted on the whole tract prior to the taking, although he is entitled to recover the cost of preparing the remainder to accommodate the replacements."

In *Long* v. *Shirley*, 177 Va. 401, 14 S. E. 2d 375 (1941), the testimony showed that the construction of a new highway necessitated the removal of certain of the landowner's outbuildings, changes in the fencing and the construction of a new approach to the residence, including the removal of the banks of a cut. There the court said:

"The instruction requested by the plaintiff in error and refused by the court told the commissioners that in fixing his damages they should take into consideration these items of expense, and the inconvenience to him in the future operation of the farm resulting from the construction of the new highway. In our opinion the instruction was proper and should have been given.

"It is well settled that the cost of fencing and like expenses necessary to adjusting the landowner's property to the new situation created by the construction of a highway are proper elements of damages. *Heninger* v. *Peery, supra* (102 Va., at page 900); 18 Am. Jur., Eminent Domain, §§ 268, 269, pp. 909, 910.

"The same is true of the inconvenience which the landowner will suffer in the future operation of his property. 18 Am. Jur., Eminent Domain, § 266, p. 906." 177 Va. at 415, 14 S. E. 2d at 381.

And in *Dressler, et al.* v. *City of Covington*, 208 Va. 520, 522, 158 S. E. 2d 660, 662 (1968) we said:

"It is well settled that in determining the diminution of the market value of the land not taken or the damages thereto, it is proper to consider the expense made necessary by reason of the

improvement in adjusting the property to the changed conditions brought about by the taking. 27 Am. Jur. 2d Eminent Domain § 314, p. 133; 29A C.J.S. Eminent Domain § 274, p. 1217; *Long* v. *Shirley*, [*supra*]."

The identical issue before the court here was considered in *Smick* v. *Commonwealth*, 268 S. W. 2d 424, 425 (Ky. 1954). There the Smicks contended that since their garage was taken by the condemnation and it was necessary that they build a new one, the cost of building a new one should be considered as part of the damage to their remaining land. The court pointed out that the kind of improvement to the remaining land made necessary by the taking and for which compensation should be awarded is one which would not have been necessary at all in the absence of condemnation. The court said:

"Before the condemnation in the case before us, the Smicks had a garage on their land, which we will assume they considered to be a necessity to the enjoyment of their property. After the condemnation took their existing garage, they considered it necessary to build a new one. The necessity for *having* a garage was the same before as it was after the condemnation; the necessity was not *created* by the condemnation.

"To follow the Smicks' argument to its logical conclusion, if a farmer's dwelling was taken by condemnation, he would be entitled to recover, as part of the damage to his remaining land, the cost of building a new dwelling. This is patently absurd." 268 S. W. 2d at 425.

The effect of admitting Aldhizer's testimony that he had constructed a new grocery store on the residue of his lot was to allow the commissioners to consider the cost ($20,800) of an improvement which was voluntarily made by the landowner to the residue, and which allowed him to continue the grocery business which he once conducted on the whole lot. This testimony went to the cost of a replacement building. It was not limited to expenses necessary to adjust the lot to the new situation created by the improvement of the highway and was not a proper element of damages. It was error for the court to have admitted this evidence and to have given any instruction which allowed the commissioners to consider it in determining damages to the residue. We must therefore decide whether this action constituted harmless error.

Testifying for the city were Allen E. Turner and Mitchell R. Shell, both professional appraisers whose qualifications are shown in the record.

▮ Turner testified that the Aldhizer property was zoned as a single family dwelling residential unit, and that the use being made thereof by the owners was a nonconforming one. He determined the fair market value of the 44 square feet taken to be $19 or $0.45 a square foot. In fixing the value of the property, land and buildings taken, he used three approaches, income, cost and land value comparison. In his opinion the highest and best use of the property was the use to which it was being put by the Aldhizers, recognizing that there was serious obsolescence in the building by virtue of its proximity to the property line.

He testified that the replacement value of the two-story frame building was $17,680; of the one-story storage room, $1224; of the two-story open front porch, $1932; of the one-story open rear porch, $583; or a total reproduction value for the whole building of $21,419. He determined the fair market value of the building by depreciating it 50%, this in view of its age and condition, and arrived at a fair market value of $10,709. He appraised the garage at $300, the shed at $75 and allowed $204 for fencing, driveway and other miscellaneous items. In Mr. Turner's opinion the land taken, temporary easement and all buildings had a total fair market value of $11,407.

He further testified that there was no damage to the residue by the construction of the highway. The site remained identical as it existed before, absent only the buildings. He said that the value of the lot was greatly enhanced by the construction, and that had the buildings not been removed they would have been rendered totally obsolete by reason of the construction of the highway and the elimination of permissive parking in front of the building.

Shell testified that he made appraisals of a number of properties in the vicinity of the Aldhizer property, checked sales along Route 250, some in Staunton and some outside the city, which he considered reasonably comparable to the property involved. He specified three sales in particular that he regarded as comparable.

In his opinion the 44 square feet taken by the city in fee had a fair market value of $24, or of $0.55 a square foot. After making a study of several small groceries in the area that he regarded as comparable, he concluded that the Aldhizers' property—land, temporary easement and buildings taken by the city, had a total fair market value of $13,774. His breakdown of values is as follows: land—

$24; two-story frame store—$13,000; garage—$110; shed—$50; fences —$11; landscaping—$48; driveway—$7; cistern—$50; temporary easement—$100; and miscellaneous—$374.

His opinion was based on an analysis of all the information that he had available, replacement cost less depreciation, income, and the general level of values of comparable property. He stated that there was no damage to the residue, and that the lot had the same value with the buildings removed as it had prior thereto.

Mr. Aldhizer placed no valuations on his property or the buildings that were taken. The only figure mentioned in his testimony was the cost ($20,800) of the construction on the residue of his new grocery store.

The defendants called John A. Clem, III, who testified that he had been engaged in the real estate and insurance business in Staunton for over 25 years, and was familiar with the fair market value of real estate in and near the city. He valued the 44 square feet taken by the city at $44, basing this figure on a valuation of $1.00 a square foot, or $40,000 an acre. In his opinion the buildings on the property had a total replacement value of $42,000. He estimated the property to be 30 years old and he depreciated it 2% a year or 60%, and he testified that the buildings had a replacement value after depreciation of $25,200. On cross-examination it was brought out that in computing depreciation, Clem made a mistake of $8,400 and that using his figures, as corrected, the replacement value of the buildings, less depreciation, was $16,800 instead of $25,200. In addition, it appears that Mr. Clem figured replacement cost at $10 per square foot for the two-story building and assumed it to be 40 feet x 50 feet. Thereby he included both open porches and estimated the replacement cost of the entire area to be the same. He gave the storage room a replacement cost of $5 per square foot, but estimated its area as 400 square feet. Aldhizer testified that his store building was 32½ feet x 39 feet. The diagram shows it to be 34 feet x 40 feet 2 inches.

After testifying as to replacement costs Clem stated that he tested this valuation against the income approach. In making this test he set up the income of the upstairs apartment at $65 per month, and assumed the store or first floor to have an income producing value of $185 per month. After making allowances for taxes, insurance and maintenance, he assumed a net estimated income from the buildings of $2430. He then capitalized the building at 10% of its net income and said that under the income approach the property had a value of $24,300. By combining the two approaches, and making no allow-

ances for his error in computing the replacement cost, he testified that the building had a value of $24,750. During the course of his testimony Clem also ascribed various other values to the property—$29,750, $24,800 and $27,250. It is difficult to determine therefrom whether he meant the property that was taken and damages, or the entire property prior to take. He valued the remaining lot at $4,950 and said that he "damaged the balance 10%" giving his reason that "this property was on the front of the lot before the take or the damage from temporary easement and now it is situated so that there is one completely blind side". We surmise that Mr. Clem intended this $495 to be his estimate of damages to the residue.

It was shown that notwithstanding Clem assigned the store a monthly rental value of $185 he did not have, in his language, "any comparable neighborhood groceries but I have comparable space".

Clem's testimony does not admit of analysis. His estimate of fair value of the buildings, based upon cost of replacement, was predicated upon an error and is admittedly erroneous. His testimony further shows that he figured the cost of replacement on incorrect dimensions of the building, based the cost of replacing the first floor and second floor at exactly the same figure, and the cost of replacing open porches at the same cost as the main building. When he came to the income approach the witness admitted that he did not use comparable properties to arrive at a fair return for the first floor grocery store.

While commissioners are given a wide latitude in determining values, for them to consider the testimony of a witness and his judgment as to values, such judgment must be supported by reasonable grounds or it is worth little. *Appalachian Elec., Etc., Co.* v. *Gorman*, 191 Va. 344, 357, 61 S. E. 2d 33, 39 (1950). The testimony of Mr. Clem is confused, vague and indefinite.

The amount of land involved here is minimal and the discrepancies between its value as fixed by Turner, Shell and Clem are not too significant. However, absent the testimony of Clem, the only valuations of witnesses remaining in the record are the valuation of Shell in the amount of $13,774, and Turner in the amount of $11,407.

The commissioners allowed $22,000 representing value of the land, buildings and easement, and $500 damages to the residue. Again, without the testimony of Clem, the only figure in the record in excess of $13,774 is the cost to Mr. Aldhizer ($20,800) of constructing a replacement grocery store. The only evidence of damages to the

residue was Clem's statement that he "damaged the whole lot by 10%, or $495".

In *Breeding, Adm'r* v. *Johnson*, 208 Va. 652, 659, 159 S. E. 2d 836, 842 (1968), we reaffirmed the general rule in Virginia regarding harmless error as follows:

> " 'Error will be presumed prejudicial unless it plainly appears that it could not have affected the result. A plaintiff in error must always show, not only error in the rulings of the trial court, but also error of a substantial nature. When once he has pointed out an error of a substantial character, he is entitled to have it corrected if it appears from the record that there is reasonable probability that it did him any harm. There is no presumption that error is harmless.' [Citing cases.]"

In *Iron Company* v. *Railroad Company*, 200 Va. 698, 704-05, 107 S. E. 2d 421, 426 (1959), we made this observation on harmless error which is pertinent to the instant case:

> "Finally, complaint is made of the rulings of the trial court on the admissibility of evidence and the instructions relating to the measure or quantum of damages. It is not necessary that these rulings be examined in detail, for it is well settled that such rulings, even if erroneous, were harmless in view of the jury's verdict which disallowed Peck's claim for any damages.
>
> "Illustrative of this principle is *Going's Admx.* v. *Norfolk & Western Ry. Co.*, 119 Va. 543, 556, 89 S. E. 914, in which we held that the admission of certain evidence relating to damages, if erroneous, was harmless error. See also, *Bardach Iron & Steel Co.* v. *Charleston Port Terminals*, 143 Va. 656, 675, 129 S. E. 687; 3 Am. Jur., Appeal & Error, § 1042, p. 597.
>
> "Similarly, it is generally held that an erroneous ruling on instructions relating to the measure or quantum of damages is harmless where there is a verdict for the defendant. 5A C. J. S., Appeal & Error, § 1773(2), pp. 1250, 1251, where numerous cases on the subject are collected; 5 Mich. Jur., Damages, § 84, p. 576."

The defendants argue that the allowance by the commissioners of only $500 as damages to the residue shows that the admission of testimony as to the cost of the replacement building was harmless. However, we are unable to say from the record in this case that the commissioners could or did disabuse their minds of the evidence that Aldhizer had expended $20,800 to replace a store which he had op-

erated over a long period of years, and that they did not consider such replacement costs in arriving at their overall award which aggregated $22,500—this, notwithstanding the express language of their report.

Admittedly the commissioners were not bound by the opinion of the city's appraisers or by the apparent weight of the evidence and could give their own conclusions based upon their view of the land. However, as we pointed out in *Virginia Electric, Etc., Co.* v. *Pickett*, 197 Va. 269, 276, 89 S. E. 2d 76, 81 (1955), "[t]hat rule is not to be considered as turning commissioners loose to take arbitrary or capricious action and return awards not related to the value of the property. *Their awards are to be measured by the evidence* and if the evidence clearly shows them to be unreasonable they should be set aside". (Italics supplied.)

We express no opinion here as to the value of the property taken or the damages, if any, to the residue. We consider only whether the injection in the case of the $20,800 replacement cost was harmless error. The introduction of this evidence was error and it is presumed to be prejudicial unless it plainly appears that it could not have affected the results. When considered together with the clear and cogent testimony of Turner and Shell, the photographs of the buildings and other exhibits, and the unsatisfactory evidence given by Clem as to value, we can but conclude that the error was of a substantial nature and that there is reasonable probability that it did the city harm.

Accordingly, the judgment of the trial court confirming the report of the commissioners is set aside, and the cause is remanded for a new trial.

*Reversed and remanded.*